**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ACE HARDWARE CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **10 C 2884** |
| | ) | |
| **LANDEN HARDWARE, LLC,** | ) | |
| **MARKETPLACE HARDWARE, LLC,** | ) | |
| **WILLIAM B. LOVETT, STEVEN D.** | ) | |
| **MCMAHAN, LINDA LOVETT, and** | ) | |
| **SANDRA MCMAHAN,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM AND ORDER**

Defendants Landen Hardware and Marketplace Hardware each were Ace Hardware franchisees, and individual defendants William and Linda Lovett signed guaranties connected with the agreements between Landen and Marketplace and Ace Hardware.[1] Ace has filed a motion for summary judgment, contending that the franchisees breached a variety of contracts and the Lovetts are liable under their personal guaranties. On the other hand, the franchisees and the Lovetts contend that the doctrine of equitable estoppel bars any recovery by Ace. For the following reasons, Ace's motion is granted.

I.      **Background**

A.      **Local Rule 56.1**

Local Rule 56.1 requires a party seeking summary judgment to file a statement of material facts, submitted as short numbered paragraphs containing citations to admissible

---

[1] Ace also named Steven and Sandra McMahan – who guaranteed the Ace-Landen contracts – as defendants. The parties agree that the McMahans filed a voluntary bankruptcy petition, although they do not provide any specifics. Due to what appears to be a pending bankruptcy proceeding, the claims against the McMahans are hereby stayed.

evidence. Loc. R. 56.1(a).  So far, so good, as Ace's statement of material facts consists of

declarative factual statements accompanied by citations to the record.  Local Rule 56.1 also

requires the opposing party to either admit or deny each paragraph and cite to its own supporting

evidence. Loc. R. 56(1)(b)(3)(A).  The defendants' response largely fails to meet this

straightforward standard as it is argumentative and attempts to create factual disputes that are

irrelevant.

For example, in response to the innocuous statement "William Lovett and Steven

McMahan (hereafter, "the doctors") were business partners in a medical company and a medical

leasing company," the defendants respond:

> Admit only that the doctors were the sole partners in a closed corporation that
> employed them to provide emergency medical services.  Admit only that the
> doctors were also partners in a company that leased the equipment that they used
> in providing their medical services.  (Defs' Exhibit A, Lovett Decl. ¶ 3).  The
> medical leasing company did not confer any special business expertise in the
> doctors because the medical leasing company was established by their attorney as
> an operational convenience and had no business other than that relating to the
> doctors' medical services.

Response to Ace's Statement of Facts at ¶ 7, Dkt. 119 at Page ID# 2126.  The defendants appear

to be casting about for ways to create a factual dispute since clearly, there can be no actual

dispute that the doctors were "business partners in a medical company and a medical leasing

company."  To the extent that the responses do not state "deny" and then provide a brief

explanation accompanied by citations to the record, Ace's statements of fact are deemed

admitted.  *See* Loc. R. 56(1)(b)(3)(A) (failure to adequately reference affidavits, the record, or

other materials relied upon to support the party's denial may result in admission of the movant's

facts to the extent supported by the record); *Bone Care Intern., LLC v. Pentech Pharmaceuticals*,

*Inc.*, No. 08 C 1083, 2012 WL 1068506, at *1 (N.D. Ill. Mar. 29, 2012) ("To the extent that

Plaintiffs' denials are evasive and Defendants' statements are supported by admissible evidence, those statements will be admitted").

Similarly, the court will disregard the defendants' arguments about the legal import of the allegedly disputed facts as it is well established that arguments belong in memoranda, not Rule 56.1 responses. *See Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement" or response); *see also Sys. Dev. Integration, LLC v. Computer Sci. Corp.*, 739 F.Supp. 2d 1063, 1068 (N.D. Ill. 2010) ("the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, and thus the Court will not address the parties' arguments made in their Rule 56.1 statements and responses") (citation omitted).

The defendants' attempt to interject arguments into their Rule 56.1 response is particularly striking as the court allowed them to file an oversized response brief. A litigant may not circumvent page limitations by adding arguments into a Rule 56.1 response. Accordingly, the court will not consider any of the defendants' legal arguments raised in their Rule 56.1 response. This means that most of Ace's facts are deemed admitted, as the defendants repeatedly respond to statements of fact by stating that the doctrine of equitable estoppel provides a complete defense to Ace's claims. For the purposes of Rule 56.1, that is neither here nor there as this contention does not "admit or deny" Ace's statements of fact or direct the court's attention to evidence supporting a denial. *See* Loc. R. 56.1(b)(3)(A).

The defendants also have declined to directly respond to statements of fact, such as "[p]ursuant to the Equity Match Loan Agreement/Promissory Note, Ace provided to Landen the

sum of $180,000," by stating that they "are without sufficient knowledge to admit or deny." Response to Ace's Statement of Facts at ¶ 9, Dkt. 119 at Page ID# 2127. This type of response is ineffective at the summary judgment stage as it neither admits nor denies Ace's facts and is unsupported by citations to the record. Hence, to the extent that the defendants state that they lack knowledge to admit or deny, Ace's corresponding facts are deemed admitted to the extent they are supported by the record. *See, e.g., Marchman v. Advocate Bethany Hosp.*, No. 04 C 6051, 2006 WL 1987815, at *6 (N.D. Ill. Jul. 12, 2006) (the failure of the party opposing summary judgment to point to "controverting evidence in the record" means that the movant's facts are admitted).

Moreover, some of the defendants' responses are flat out unhelpful. For example, in response to information about Landen's citizenship, the defendants state "Deny. Landen is no longer in existence." Response to Ace's Statement of Facts at ¶ 3, Dkt. 119 at Page ID# 2125. This is not only unresponsive but also at odds with the fundamental principle that the court must consider whether subject matter jurisdiction in this diversity case exists.

The court will also disregard unresponsive "add on" facts to Ace's facts, such as the defendants' commentary about unrelated matters following their admission that venue in this district is proper. *See* Response to Ace's Statement of Facts at ¶ 6, Dkt. 119 at Page ID# 2125.

The defendants' statement of additional facts also includes argumentative characterizations of facts. For example, the defendants state that Ace's conduct "forced" the McMahons into personal bankruptcy and that Ace "bombarded" them with promises about profitability. Response to the Defendants' Statement of Additional Facts at ¶ 3, Dkt. 119 at Page ID# 2145. The court will disregard this type of language as it is improper. The court also notes

that any future filings by counsel for the defendants must contain "short" paragraphs of "facts" as opposed to lengthy narratives. *See* Loc. R. 56.1(b)(3)(c). Finally, to the extent that any statement of additional fact is not supported by citations to the record, it will not be considered. *See id.*

With these caveats in mind, the court turns to the facts, which are actually quite straightforward.

### B.     Facts

In this diversity case, Ace is an Illinois citizen with its principal place of business in Illinois, William and Linda Lovett and Steven and Sandra McMahon are Ohio citizens, and Landen and Marketplace are Ohio limited liability companies whose sole members are William Lovett and Steven McMahon. William Lovett and Steven McMahon are doctors who made the fateful decision to open two Ace franchises that ultimately led to this lawsuit.

### 1.     Overview of Ace's Complaint[2]

In July of 2006, Landen and Ace signed an Equity Match Loan Agreement under which Ace, among other things, promised to lend money to Landen and Landen executed a promissory note promising to repay the loan plus interest. Pursuant to the Equity Match Loan Agreement, Ace loaned $180,000 to Landen. Landen did not repay Ace and does not dispute that if its promissory estoppel argument fails, it currently owes Ace over $190,000. Count I of Ace's complaint is against Landen and is based on an alleged breach of the Equity Match Loan Agreement and promissory note. Count II is a similar count against Marketplace based on its

---

[2] Due to the McMahons' bankruptcy, the court will focus on the claims against Landen, Marketplace, and the Lovetts.

execution of an Equity Match Loan Agreement and promissory note and its failure to repay $200,000 loaned by Ace plus interest.

Counts III and IV are breach of contract claims against Landen and Marketplace, respectively, based on their alleged breaches of the Ace Hardware Membership Agreement. Landen and Marketplace ordered merchandise and services from Ace pursuant to that agreement and did not repay Ace.

William Lovett signed two guaranties of credit under which he promised to repay all debts owed by Landen. Count V is directed at him and alleges that he breached the guaranties. William and Linda Lovett also signed personal guaranties for all "liabilities, obligations, and indebtedness" owed by Landen. Ace refers to these guaranties as the Equity Match Guaranties, and they form the basis of Count VI.

## 2. The Parties' Contracts

On February 16, 2006, Dr. Lovett and Dr. McMahon signed a "Prospective Member Certification" which provides, in part, that:

> **Personally and on behalf of any corporation, partnership or limited liability company that now or subsequently owns and operates my Store, I hereby represent and warrant to Ace that each of following statements is true, correct and complete:**
>
> 1. I understand that numerous business risks apply to owning and operating my Store, and that my Store's success or failure will be highly dependent on such variables such as my personal skills and efforts as an independent businessperson and manager, my Store's location, product mix and pricing strategies; my competition; the economy, labor and supply costs; and my Store's lease or purchase terms. I am willing and able to assume all business risks associated with owning and operating my Store . . . .
>
> 3. I have had sufficient time and opportunity to conduct an independent investigation and analysis of the retail hardware business in general, and Ace retail hardware store in particular. I have consulted with my own legal and

business advisors about the potential benefits and risks associated with owning and operating my Store.

4.      I have undertaken my own investigation and analysis of any preliminary or final information such as retail sales forecasts, demographic data, target penetration surveys or similar data and materials prepared or provided to me by Ace (collectively, "Site Data") regarding possible locations for my Store and the market in which it is or will be located, and on the basis thereof, have myself selected the site for my Store. I have relied, if at all, on the Site Data only to the extent I find warranted based on my own investigation and analysis. I affirm that I am solely Responsible for selecting my Store's location and negotiating its lease or purchase terms.

5.      I have undertaken my own investigation and analysis of any pro forma financial statement or other financial projections prepared or provided to me by Ace (collectively "Projections") for my Store, and on the basis thereof, I (i) adopt the Projections as my own; (ii) vouch for their reasonableness; and (iii) acknowledge their role as estimates only, and not as guarantees, of my Store's future performance. I am willing to assume the risk that my Store's actual financial performance may differ substantially from the Projections. I agree that Ace will not be responsible if my Store, for any reason, fails to meet my or Ace's expectations as to financial or operational performance . . . .

8.      I will enjoy financial and other rewards if my Store succeeds. However, if my Store does not succeed, I understand that I could lose not only my entire investment in my Store, but also owe amounts in excess of the amount I invested by virtue of obligations I have incurred or will incur to various parties such as my bank(s), my landlord, and my suppliers, including Ace. I am willing and able to assume this risk.

9.      I have not received nor relied upon any representations, assurances, warranties, guarantees, or promises made by Ace or any of its directors, officers, employees or agents (including any franchise broker) concerning actual, average, projected or forecasted sales, revenues, profits, earnings or other financial results that I might or should expect to achieve from owning and operating my Store.

Ace's Statement of Facts at ¶ 28, Ex. Q, Dkt. 108 (emphasis in original).

The membership agreements between Ace and Landen and Ace and Marketplace provide, in part, that:

10.      **Site Approval or Acceptance.** The Member hereby acknowledges and

agrees that the Company's approval or acceptance of a site for the Member's store does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the member location for such store or the successful operation or profitability of the store hereunder. The Company's approval or acceptance of any site, including the member location, indicates only that the Company believes that such site falls within acceptable minimum criteria established by the Company solely for the Company's own purposes and benefit at the time of the Company's approval or acceptance thereof. The parties acknowledge that application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for the member location and that demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from the Company's own criteria could change, thereby altering the potential thereof. The parties acknowledge that such factors are unpredictable and are beyond the Company's control, and the Member agrees that the Company shall not be responsible for the failure of any site approved or accepted by the Company to meet the Member's expectations as to revenue or operational criteria, or otherwise. The Member also represents and warrants that its acceptance of a membership for the operation of a retail store at the member location is based on its own independent investigation of the suitability of the site for such purpose.

**11.** **Further Representations of Member.** As an inducement to the Company to enter into this Agreement, the Member further represents and warrants as follows: (a) that the Member has conducted an independent investigation of the business contemplated by this Agreement, and recognizes that the nature of the business or its market area are subject to change over time, that the Member's investment involves business risks; (b) that no representations have been made by the Company or by any of its officers, directors, employees or agents that are contrary to the terms contained in this Agreement, or contrary to any statements contained in any disclosure document heretofore delivered to the Member; and (c) the Member has not received or relied upon any guarantee, whether express or implied, of the sales, revenues, profits or success of the business venture contemplated by this Agreement.

*Id*. at ¶ 29, Exs. G & I, Dkt. 108.

Ace also provided a Site Audit Report that contained a disclaimer that stated, "NOTE: A

SITE AUDIT IS NOT AN INDICATION OF MARKET QUALITY. IT IS ONLY RATING

THE SPECIFIC REAL ESTATE QUALITY. TO DETERMINE MARKET POTENTIAL, A

SALES FORECAST MUST BE RUN IN ADDITION TO THIS AUDIT." *Id.* at ¶ 30, Ex. R,

Dkt. 108.

A document entitled "Ace Sales Forecast" for one of the defendants' stores that is dated

January 13, 2006, also contained a disclaimer:

> Important: These figures are intended to be used in analyzing a potential retail
> store location and are not to be used in completing a proforma financial statement.
> Ace Hardware Corporation makes no representation or warranty of any kind,
> express or implied as to: (1) the accuracy or completeness of the information
> contained herein; (2) the suitability of any site for the successful operation of an
> Ace Hardware Store; or (3) any financial projections or estimates, including but
> not limited to the achievement of any sales, revenues, or profits at this or any
> other location. No representative of Ace Hardware Corporation is authorized to
> make any representation to the contrary.

*Id.* at ¶ 31, Ex. S, Dkt. 108.

Dr. Lovett and Dr. McMahon also signed "Proforma Projections" dated February 16,

2006, April 25, 2006, and June 8, 2006, from Ace for their respective stores that contained

disclaimers.[3]  The following language, in all capital letters, was set out inside a box:

THESE PROJECTIONS (FORECASTS), INCLUDING SALES, PROFITS, OR EARNINGS
ARE MERELY ESTIMATES AND SHOULD NOT BE CONSIDERED AS THE ACTUAL
OR POTENTIAL SALES, PROFITS OR EARNINGS THAT WILL BE REALIZED BY ANY
SPECIFIC STORE OPERATOR. ACE HARDWARE CORP. DOES NOT REPRESENT
THAT ANY STORE OPERATOR CAN EXPECT TO ATTAIN THESE SALES PROFITS OR
EARNINGS.

---

[3]  The defendants neither deny that Dr. Lovett and Dr. McMahon signed the "Proforma
Projections" nor challenge the language provided by Ace.  Although it is not germane to the
issues at hand, the court notes that it cannot ascertain which projections correspond with which
store, as the signatures on the documents are illegible.

*Id*. at ¶ 32, Ex. T, Dkt. 108.

At the bottom of the page, the document stated:

DISCLAIMER: The estimates herein were made jointly by the Ace Hardware Corporation representative and the store operator based on discussions between them and information furnished by the store operator, developer/leasing agent and others.

The store operator acknowledges that these figures assume good and complete development and management of the shopping center or trade area, good store management, the handling of an appropriate mix of merchandise, and normal favorable business conditions. The store operator further acknowledges that Ace Hardware makes no representation as to the projected costs, income, gross and net profits, cash flows or sales of any merchandise. Since these estimates are for general guidance only, the store operator must accept the risk of not doing as well as these estimates. Ace Hardware Corporation urges that these figures be reviewed carefully with the store operator's accountant or other business advisor prior to initiating the project. Ace Hardware Corporation also recommends that these projected estimates be compared to actual operating results at the close of the accounting period in order that business adjustments are made as necessary.

*Id*.

Finally, the individual defendants guaranteed all of the obligations of their respective stores.  The guarantees signed by the individual defendants contain a section titled "Guaranty Unconditional" which states, in pertinent part, that:

Except as otherwise set forth herein, Guarantor's guaranty of the indebtedness is continuing, absolute, and unconditional.  Without limiting the foregoing, the validity of this Guaranty and Guarantor's indebtedness hereunder shall not be impaired by any event whatsoever, including without limitation any of the following, whether or not Guarantor has any notice thereof . . .  (a) the invalidity or unenforceability of any agreement or instrument evidencing or relating to the indebtedness . . . (c) any claim of immunity, defense, set-off or counterclaim (other than full and final payment of the indebtedness) on behalf of any person or entity . . . (k) any allegation or contest of the validity of the indebtedness or this Guaranty, or the disaffirmance or attempted disaffirmance of the indebtedness or this Guaranty, in any such proceedings . . . (m) to the extent permitted by law, any other event, action or circumstance that would, in the absence of this paragraph,

result in the release or discharge of the Guarantor from the performance or
observance of any obligation, covenant or agreement contained in this Guaranty
(other than the circumstances described in Section 3).[4]

*Id*. at Ex. M & N at § 5.

The guarantees also provide:

<u>Independent Investigation</u>.  Guarantor delivers this Guaranty based solely on
Guarantor's own independent investigation and in no part upon any representation
or statement of Lender or its agents with respect to any matter whatsoever.
Guarantor is in a position to assume and hereby assumes full responsibility for
obtaining any additional information concerning the indebtedness and the
financial or other condition of the Obligors.

*Id*. at § 9.  Finally, the guarantees disclaim the existence of a fiduciary relationship between Ace

and the entity or individual defendants.  *Id*. at § 10.

### 3. The Parties' Claims

Based on all of the disclaimers, Ace contends that the defendants knowingly assumed the

risk associated with opening new stores.  Ace also denies that it told the defendants how site

scores were calculated or that it provided inaccurate information.  In contrast, the defendants

point to evidence showing that Ace held itself out as an expert on how to site and run Ace

franchises.  They also contend that information provided by Ace was inaccurate and to the extent

they did not know this prior to opening their stores, that information was only available from

Ace and thus was not independently verifiable.  Specifically, they blame the failure of their two

Ace stores on faulty information provided by Ace (site audit reports and sales forecasts) and

poor locations recommended by Ace.

---

[4]  Section 3 states that the "Guaranty cannot be cancelled by Guarantor and shall remain
in full force and effect until the earlier of full and final indefensible payment and discharge of all
of the Obligations (or all Obligors)."  *Id*. at Ex. M & N at § 3.

As the Landen store began to fail, Dr. McMahon sent an email to Ace's head of new business, John Venhuizen, complaining about the store's performance.  Ace subsequently revised the site audit report (which estimates how a given store will perform) for the Landen site downwards.  The revised report contained the same disclaimers as the original report.  The parties disagree as to the basis for the revised figures and whether they show that the original report was inaccurate.  The doctors state that they would not have agreed to open a store at a location with the numbers associated with the revised report.  They also contend that Ace "steered" them away from other sites that would have been successful.  In response, Ace notes that the doctors signed the Prospective Member Certification stating that they were responsible for selecting store locations.  *See* Ace's Statement of Facts, Ex. Q, Dkt. 108.

The parties also disagree as to where the blame lies for the failed stores.  Ace stresses that it made no guarantees and provided the best available information it could.  The doctors, on the other hand, claim that Ace's information was faulty (for example, they assert that Ace did not adjust the recommended product mix based on the number of condominium owners vs. single family home owners in the area near the Landen store).

## II.     Discussion

### A.      Standard for A Motion For Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Valenti v. Qualex, Inc.*,

970 F.2d 363, 365 (7th Cir. 1992). A court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Id.*

To successfully oppose a motion for summary judgment, however, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, it must demonstrate that a genuine issue of fact exists. *See id.* at 587; *see also* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact" the court may: "(1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or (4) issue any other appropriate order").

### B.    Equitable Estoppel

Ace's motion for summary judgment is based on the purported breach of various contracts between Ace and the defendants. In response, the defendants contend that the doctrine of equitable estoppel is a complete defense to Ace's breach of contract claims and that they are entitled to present this defense to a jury. Under Illinois law:

> [i]n order for equitable estoppel to apply, the following six elements must be present: (1) the party to be estopped made a misrepresentation or concealment of material fact by words or conduct; (2) the party to be estopped knew or had reason to know the falsity of the misrepresentation or concealment; (3) the party asserting the estoppel did not know, or have reason to know, that the misrepresentation or concealment was false; (4) the party to be estopped intended, or reasonably expected, that the party asserting the estoppel would detrimentally rely on the misrepresentation or concealment; (5) the party asserting the estoppel detrimentally relied on the misrepresentation or concealment, both reasonably and in good faith; and (6) the party asserting the estoppel would be prejudiced if the party to be estopped were permitted to avoid the falsity of the misrepresentation or concealment. In order to benefit from estoppel, the party asserting the estoppel

-13-

cannot neglect to seek information that is easily accessible and must have had no knowledge or means of knowing the true facts.

*Ahle v. D. Chandler, Inc.*, — N.E.2d —, 2012 WL 988020, at *6 (Ill.App. 5 Dist. Mar. 23, 2012) (internal citations omitted).

Ace contends that the defense of equitable estoppel is unavailing with respect to its breach of contract claims against the defendants as they waived their ability to raise this defense by agreeing that Ace "shall not be responsible for the failure of any site approved or accepted by the Company to meet the Member's expectations as to revenue or operational criteria, or otherwise" and "will not be responsible if my Store, for any reason, fails to meet my or Ace's expectations as to financial or operational performance." Ace next argues that it is important to distinguish between the entity defendants and the individual defendants. The individual defendants, including the Lovetts (who are not subject to an automatic stay as unlike the McMahons, they did not file for bankruptcy) signed unconditional guarantees that comprehensively disclaim any ability to avoid the guarantees on any basis whatsoever, including:

> (a) the invalidity or unenforceability of any agreement or instrument evidencing or relating to the indebtedness . . . (c) any claim of immunity, defense, set-off or counterclaim (other than full and final payment of the indebtedness) on behalf of any person or entity . . . [and ] (k) any allegation or contest of the validity of the indebtedness or this Guaranty, or the disaffirmance or attempted disaffirmance of the indebtedness or this Guaranty, in any such proceedings . . .

Ace's Statement of Facts at Ex. M & N at § 5. Ace thus asserts that they are entitled to summary judgment on their breach of guaranty claim. The fate of Ace's motion for summary judgment turns on whether the defense of equitable estoppel is available for the breach of contract or breach of guaranty claims.

### 1.     Breach of Contract Claims

As noted above, Count I of Ace's complaint is against Landen and is based on an alleged breach of the Equity Match Loan Agreement and promissory note.  Count II is a similar count against Marketplace based on its execution of an Equity Match Loan Agreement and promissory note and its failure to repay $200,000 loaned by Ace plus interest.  Counts III and IV are breach of contract claims against Landen and Marketplace, respectively, based on their alleged breaches of the Ace Hardware Membership Agreement.

Reasonable reliance on statements made by Ace is one of the elements of the defendants' equitable estoppel claim.  The court thus begins by considering whether the existence of the disclaimers in the contracts means the defendants' alleged reliance on Ace's statements is unreasonable as a matter of law.  The defendants reach the disclaimers in the final four pages of their nineteen page response to Ace's summary judgment motion.  According to the defendants, they were entitled to rely on Ace's representations regarding the viability and projected future success of the Landen and Marketplace stores regardless of the language of the disclaimers.  Thus, they assert that they are entitled to a trial, as the reasonableness of reliance is always a question of fact that must be determined by a jury.  *See* Dkt. 118, at 15-16.  Alternatively, the defendants contend that the disparity in the parties' circumstances means that the disclaimers are unenforceable.

### a.     Reliance

The parties agree that Illinois law applies.  It is well established that "[i]n Illinois, the objective in interpreting a contract is to ascertain and give effect to the intent of the parties.  Most important are the objective manifestations of the parties, including the language they used

in the contract. Where the contract's language is plain, the agreement should be enforced as written." *Gore v. Alltel Communications, LLC*, 666 F.3d 1027, 1033 (7th Cir. 2012) (internal citations and quotations omitted). The defendants' primary argument does not directly address this basic principle. In effect, the defendants ask the court to ignore the comprehensive disclaimers, which shift the repercussions of any problems with the stores from Ace to them, because they believe Ace provided inaccurate information to them.

The court empathizes with the defendants, who clearly now regret assuming complete responsibility for the success or failure of their stores and have suffered severe financial repercussions flowing from the failure of the stores. Nevertheless, it declines to redline clear contractual language from the parties' contracts simply because, with the wisdom of 20/20 hindsight, the defendants believe that they got a poor bargain. In this regard, the court finds its colleague's decision in *Siemer v. Quizno's Franchise Co. LLC*, 07 C 2170, 2008 WL 904874 (N.D. Ill. Mar. 31, 2008), to be instructive. In the *Siemer* case, six sandwich shop franchisees claimed that the franchisor's misrepresentations fraudulently induced them to sign franchise agreements for stores that subsequently were unsuccessful. The court concluded that any reliance on the alleged misrepresentations was unreasonable as a matter of law, explaining:

> But as set forth above, the [contracts] each contain disclaimers and non-reliance clauses that are repetitive and easily seen by any party who takes the time to read them. Faced with these "unambiguous" clauses, plaintiffs cannot have reasonably relied upon any oral statements concerning likely profits and expenses in deciding whether to invest in a Quizno's franchise. Indeed, as explained above, Plaintiffs reviewed and even signed representations affirming that they would not rely on any statements outside the corners of the contractual documents.

*Id*. at *8 (internal citations omitted).

The court will not again fully recount the numerous contract provisions set out in detail above that reflect the parties' agreement regarding assumption of the risks associated with owning and operating an Ace franchise. In sum, the defendants agreed that:

- owning and operating a business carries risks and that they were "willing and able to assume all business risks associated with owning and operating [their] Store"

- they had consulted with their own business and legal advisors about the potential benefits and risks associated with owning and operating an Ace franchise and had investigated information provided by Ace and relied upon it, "if at all . . . only to the extent [they] find warranted based on [their] own investigation and analysis"

- financial information provided by Ace was an estimate, not as a guarantee, of future performance and they were "willing to assume the risk that [their] Store's actual financial performance may differ substantially" so Ace would "not be responsible if [their] Store, for any reason, fails to meet . . . expectations as to financial or operational performance"

- if their stores did not succeed, they could lose their "entire investment" and also "owe amounts in excess of the amount [they] invested by virtue of obligations [they] have incurred or will incur to various parties such as my bank(s), my landlord, and my suppliers, including Ace. [They were] willing and able to assume this risk."

- they did not receive or rely on any representations "concerning actual, average, projected or forecasted sales, revenues, profits, earnings or other financial results that [they] might or should expect to achieve from owning and operating [their] Ace franchise."

- Ace's approval or acceptance of a site for a store "does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the member location for such store or the successful operation or profitability of the store hereunder. The Company's approval or acceptance of any site, including the member location, indicates only that the Company believes that such site falls within acceptable minimum criteria established by the Company solely for the Company's own purposes and benefit at the time of the Company's approval or acceptance thereof. The parties acknowledge that application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for the member location and that demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from the Company's own criteria could change, thereby altering the potential thereof. The parties acknowledge that such factors are unpredictable and are beyond the Company's control, and the Member agrees that the Company shall not be responsible for the failure of any site approved or accepted by the Company to meet the Member's expectations as to revenue or operational criteria, or otherwise. The Member also represents and warrants that its acceptance of a membership for the operation of a

retail store at the member location is based on its own independent investigation of the suitability of the site for such purpose."

- with respect to the site audit, which contained information about the store locations, Ace "makes no representation or warranty of any kind, express or implied as to: (1) the accuracy or completeness of the information contained herein; (2) the suitability of any site for the successful operation of an Ace Hardware Store; or (3) any financial projections or estimates, including but not limited to the achievement of any sales, revenues, or profits at this or any other location. No representative of Ace Hardware Corporation is authorized to make any representation to the contrary."

- projections, "including sales, profits, or earnings are merely estimates and should not be considered as the actual or potential sales, profits or earnings that will be realized by any specific store operator. Ace Hardware Corp. does not represent that any store operator can expect to attain these sales profits or earnings."

- "Ace Hardware makes no representation as to the projected costs, income, gross and net profits, cash flows or sales of any merchandise. Since these estimates are for general guidance only, the store operator must accept the risk of not doing as well as these estimates."

Based on the contract's clear and unequivocal language, the defendants cannot have reasonably relied on Ace's alleged statements about the stores, the suitability of the stores' locations, or purported promises of future financial success. Accordingly, their equitable estoppel claim fails as a matter of law. See *Kennedy v. Venrock Associates*, 348 F.3d 584, 592 (7th Cir. 2003) ("reliance cannot be reasonable when it presupposes a failure to read clear language") (collecting cases). This means that Ace is entitled to summary judgment as to Counts I, II, III, and IV as to the Lovetts, Landen, and Marketplace.

## 2. Breach of Guaranty Claims

William Lovett signed two guaranties of credit under which he promised to repay all debts owed by Landen. Count V is directed at him and alleges that he breached the guaranties. William and Linda Lovett also signed additional personal guaranties for all "liabilities,

-18-

obligations, and indebtedness" owed by Landen. Ace refers to these guaranties as the Equity Match Guaranties, and they form the basis of Count VI.

The court's discussion of the reliance element of equitable estoppel defense in connection with the breach of contract claims is equally applicable to Ace's claims based on a breach of the guaranties. The Lovetts, however, raise a fall-back argument for the breach of guaranty claims: the disclaimers in the guaranties are invalid under Illinois law based on inequitable circumstances because the bargaining positions of Ace and the defendants were widely divergent. In support, the Lovetts direct the court's attention to *Garrison v. Combined Fitness Ctr., Ltd.*, 201 Ill. App. 3d 581 (1st Dist. 1990). In that case, the Illinois Appellate Court noted that "[a]ccording to Illinois law, a party may contract to avoid liability for his own negligence and, absent fraud or wilful and wanton negligence, the contract will be valid and enforceable unless: (1) there is a substantial disparity in the bargaining position of the two parties; (2) to uphold the exculpatory clause would be violative of public policy; or (3) there is something in the social relationship between the two parties that would militate against upholding the clause. The rationale for this rule is that courts should not interfere with the right of two parties to contract with one another if they freely and knowingly enter into the agreement." *Id*. at 584-85 (internal citations omitted).

According to the Lovetts, Ace provided inaccurate financial information about the stores and, "while perhaps not a fiduciary in the legal sense of the word," held itself out as having "specialized knowledge about hardware stores." Dkt. 118, at Page ID#2119. Thus, they decided to proceed with the Ace franchises based on Ace's alleged representations about the stores' projected success.

There are three problems with this argument.  First, the guaranties specifically disclaim the existence of any fiduciary relationship between Ace and the defendants.  Ace's Statement of Facts, Ex. M & N at § 10.  Thus, a claim based on a quasi-fiduciary relationship (to the extent that such a thing exists) is directly at odds with the guaranty's plain language.

Second, the alleged disparity between the parties, according to the Lovetts themselves, concerns knowledge about hardware stores.  Illinois law, however, looks to whether "there is a substantial disparity in the bargaining position of the two parties."  *Garrison v. Combined Fitness Ctr., Ltd.*, 201 Ill. App. 3d  *Id*. at 584-85.  The fact that Ace may have known more about Ace franchises than the Lovetts does not create a fact question as to the parties' bargaining power.  This is especially true where the defendants, as detailed above, specifically agreed that they were assuming all of the risks associated with the stores and signed contracts stating that Ace was not making guarantees regarding the stores' performance.

Third, the court disagrees with the Lovetts' claim that public policy concerns mean that the disclaimers exculpating Ace are invalid.  In support, the Lovetts state that "each store hemorrhaged cash and lost big, from the beginning."  Dkt. 118, at Page ID#2121.  They appear to be claiming that the magnitude of their loss and the serious nature of Ace's alleged misrepresentations about the stores' performance mean that the court should strike down the disclaimers.

It is true that "Illinois law does not favor exculpatory clauses" and the clauses must be construed strictly against the party they benefit.  *Hamer v. City Segway Tours of Chicago, LLC*, 402 Ill. App. 3d 42, 45 (1st Dist. 2010)*, citing Scott & Fetzer Co. v. Montgomery Ward & Co.,* 112 Ill.2d 378, 395 (Ill. 1986).  Nevertheless, exculpatory clauses may be used to defeat claims

that are "explicitly covered by their terms." *Id.*; *see also United Air Lines, Inc. v. ALG, Inc.*, 916 F. Supp. 793, 795 (N.D. Ill. 1996) ("so long as the language of a guarantee agreement is clear and unambiguous, courts will readily enforce its provisions, even those containing broad statements of guarantor liability"). Moreover, the fact that a claim fails based on an exculpatory clause is not enough to make the clause violate public policy. *See id.* (upholding clause barring gym member's personal injury claim against a health club after weight-lifting equipment fell on him because "the exculpatory clause could not have been more clear or explicit" as the member agreed he would bear the "sole risk" of injury arising from the use of weights and the selection of the type of equipment to be used would be his "entire responsibility").

Here, the disclaimers in the guaranties are clear and unambiguous. The Lovetts agreed to the terms, and unfortunately for the Lovetts, unambiguous waivers of the ability to raise defenses are "enforceable under Illinois law, notwithstanding their severity." *United Air Lines, Inc. v. ALG, Inc.*, 916 F. Supp. at 795. The court thus rejects the Lovetts' claim that public policy concerns entitle a jury to consider their claims against Ace free from the constraints of the contractual language agreed to by the parties. Accordingly, Ace's motion for summary judgment as to the breach of guaranty claims against the Lovetts is granted.

## C.     Damages

The defendants broadly state that they contest the amount of money they allegedly owe under the various contracts at issue. However, as discussed above, they relied on the defense of equitable estoppel to challenge the Local Rule 56.1 paragraphs regarding the amount of damages. As the court found that the defense is inapplicable and the defendants did not

otherwise contest the paragraphs, the court will proceed based on Ace's uncontroverted evidence regarding damages.

For Count I against Landen, Ace is entitled to $190,052.39 pursuant to the Equity Match Loan Agreement/Promissory Note (this amount is also included as part of the damages in Count III, so Ace is not entitled to recover any damages separately under Count I).  For Count II against Marketplace, Ace is entitled to $191,842.86 pursuant to the Equity Match Loan Agreement/ Promissory Note (this amount is also included as part of the damages in Count IV, so Ace is not entitled to recover any damages separately under Count II).  Under Count III against Landen, Ace is entitled to $497,165.21 under the Membership Agreement.  Under Count IV against Marketplace, Ace is entitled to $377,544.36 under the Membership Agreement.  All claims against Steven and Sandra McMahan are stayed as the parties report the McMahons have a pending bankruptcy case.

With respect to Count V against William Lovett and Count VI against William and Linda Lovett, Ace seeks $847,709.57 based on the personal guaranties.  The personal guaranties appear to match the guarantors' stores (*i.e.*, the Lovetts guaranteed the Marketplace store and the McMahons guaranteed the Landen store) and the parties do not specifically address the basis, if any, for holding the Lovetts liable for all of the debts for both stores.  The parties shall file brief memoranda by June 25, 2012, addressing this point.  The parties shall also address whether they believe that Rule 54(b) certification of the judgments is warranted given the effect of the automatic stay on the claims against the McMahons.

**III.     Conclusion**

For the reasons set forth above, Ace's motion for summary judgment [106] is granted. Judgment is entered in favor of Ace as to Counts I-VI of its complaint.  As to Landen, Ace is entitled to $497,165.21.  As to Marketplace, Ace is entitled to $377,544.36.  All claims against Steven and Sandra McMahan are stayed as the parties report the McMahons have a pending bankruptcy case.  The parties shall file brief memoranda by July 9, 2012, addressing whether the Lovetts are liable for the debts of both stores.  The parties shall also address whether they believe that Rule 54(b) certification of the judgments is warranted given the effect of the automatic stay on the claims against the McMahons.  This matter is set for a status hearing on July 12, 2012, at 11:00 a.m.


DATE:   June 27, 2012

_Blanche M. Manning_
Blanche M. Manning
United States District Judge